[Civ. Nos. 69854, B008269, B008131. Second Dist., Div. Four. July 23, 1985.]

STATE FARM FIRE AND CASUALTY COMPANY,
Plaintiff and Respondent, v.
P. DENNIS KEENAN et al.,
Defendants, Cross-complainants and Appellants;
PURITAN INSURANCE COMPANY,
Defendant, Cross-complainant and Appellant;
EL MONTE FLIGHT SERVICE et al.,
Defendants, Cross-defendants and Respondents;
SOUTHERN MARINE & AVIATION, INC., et al.,
Cross-defendants and Respondents.

4

## COUNSEL

Billips & Desimone, Salvatore Desimone and John F. Maloney for Defendants, Cross-complainants and Appellants.

Hart & Michaelis, Michaelis, Montanari & Johnson, Garry L. Montanari and James I. Michaelis for Defendant, Cross-complainant and Appellant and for Cross-defendant and Respondent Southern Marine & Aviation, Inc.

Owen, Melbye & Rohlff and William H. Owen for Defendants, Cross-defendants and Respondents.

No appearance for Plaintiff and Respondent.

No appearance for other Cross-defendants and Respondents.

OPINION

McCLOSKY, J.—On July 24, 1977, a Piper Lance aircraft (accident aircraft) piloted by Thomas Tobin crashed shortly after takeoff from South Lake Tahoe Airport in El Dorado County. Also on board the accident aircraft were P. Dennis Keenan and three other passengers. Keenan, who had been thrown from the accident aircraft after it hit a tree, received severe injuries when the accident aircraft landed on top of him. As a result of these injuries, both of Keenan's legs had to be amputated above the knee. Tobin and one passenger were killed. The remaining passengers sustained personal injuries.

The accident aircraft was owned by Norman and Dixie Hueckel (hereafter Hueckels). The Hueckels had purchased the accident aircraft new from El Monte Flight Service (hereafter El Monte), a fixed-base operator, and then leased it back to El Monte who in turn rented the aircraft to others.

On July 21, 1977, Tobin rented the accident aircraft from El Monte for the purpose of traveling to and from the South Lake Tahoe area during the period of July 21, 1977, to July 24, 1977. Tobin had received flight instruction and certification from El Monte and had approximately 240 hours of flying time before the accident.

As a result of the crash, lawsuits were filed by all surviving passengers and by representatives of the deceased pilot and passenger. These lawsuits were eventually coordinated by the Judicial Council in the Los Angeles Superior Court and were designated as Judicial Council Coordination Proceeding No. 799 and specially entitled "South Lake Tahoe Air Crash Cases."

On July 12, 1978, P. Dennis Keenan and his wife Arlene Y. Keenan (hereafter Keenans) filed identical actions for personal injuries and loss of consortium in both El Dorado (No. 31609) and Los Angeles (No. C247282) Counties. Among those named as defendants in these actions were El Monte and the Hueckels. Against El Monte, the Keenans stated, among others,

causes of action for products liability, negligent instruction of and negligent entrustment of the accident aircraft to Tobin, and negligent maintenance of the accident aircraft. The Keenans sued the Hueckels for negligent entrustment of the accident aircraft to Tobin.

On March 21, 1980, the Keenans served upon counsel for El Monte and the Hueckels a set of interrogatories. Interrogatories No. 4 and No. 5 read as follows:

"4. At the time of the occurrence herein, were you covered by a policy or policies of insurance?

"5. If your answer to the preceding interrogatory is in the affirmative, please state for each such policy:

"(a) The insurer;

"(b) The inclusive dates of coverage;

"(c) The limits of liability."

On March 27, 1981, El Monte served its answers to the interrogatories propounded by the Keenans. El Monte answered interrogatories No. 4 and No. 5 thusly:

"4. Yes.

"5. (a) Puritan Insurance.

"(b) 6/29/77 to 12/1/78.

"(c) $1,000,000 subject to $100,000 per seat limitation."

The policy referred to was policy H-2-2606, an aircraft hull and liability policy issued by Puritan Insurance Company (hereafter Puritan) with a liability limit of $1 million per occurrence, subject to a $100,000 per passenger seat limitation. Its declarations page disclosed that insurance coverage was afforded as to coverage D—"Single Limit–Including Passengers."

With regard to coverage D, the insuring agreement of that policy provided that Puritan agreed with El Monte "[t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages, including damages for care and loss of services, because of bodily injury, sickness or disease and, if arising out of the foregoing, mental anguish,

including death resulting therefrom, sustained by any person excluding passengers, unless the Declarations describe Coverage D as 'including passengers' and as damages because of injury to or destruction of tangible property, including loss of use thereof, caused by an occurrence and arising out of the ownership, maintenance or use of the aircraft."

Endorsement No. 1 of policy H-2-2606 contained a list of all aircraft insured thereunder. The aircraft rented by the pilot Tobin on July 21, 1977, was listed thereon as number 21. The model of the accident aircraft was PA-32R (300), and its FAA number was N1263H.

Upon receipt of this information, the Keenans commenced settlement negotiations. Believing that the liability of the Hueckels and El Monte had become reasonably clear, the Keenans, by their letter dated April 2, 1981, addressed to attorneys for Puritan, demanded the full policy limit of $100,000.

On April 23, 1980, in El Dorado case No. 34089 which had been commenced by State Farm Fire and Casualty Insurance Company against P. Dennis Keenan, Puritan and others, Puritan filed a cross-complaint for declaratory relief against the Keenans and others. Therein, Puritan sought a declaration of its rights under policy H-2-2606.

In May 1981, Puritan accepted the Keenans' settlement offer. The Keenans executed a release of all claims against El Monte and the Hueckels, and Puritan forwarded a draft in the amount of $100,000 to the Keenans. On May 26, 1981, a dismissal with prejudice relating to El Monte and the Hueckels was executed.

In August 1981, El Monte and the Hueckels amended their answers to the interrogatories originally propounded by the Keenans. The amended answers disclosed the existence of an additional policy, No. P2-1399, which El Monte and the Hueckels represented did not appear to cover the loss but was responsive to the interrogatories previously answered. El Monte was named as the insured in that policy; the Hueckels were not. The policy had a liability limit of $1 million.

After learning of the existence of policy P2-1399, Mr. Keenan executed a declaration in which he stated in essence that he and his wife would not have settled for $100,000 or signed a release agreement permitting the dismissal of El Monte if they had been aware of the additional policy which afforded El Monte $1 million coverage. Mr. Keenan further declared that he had authorized his attorney to submit a settlement demand for $100,000

only because he believed that policy H-2-2606 provided the only insurance coverage available to El Monte.

On June 25, 1981, the Keenans filed a cross-complaint for declaratory relief and damages against Puritan and others in El Dorado case No. 34089. It contained three causes of action. In their second cause of action, the Keenans alleged fraud and misrepresentation against Puritan based upon its alleged concealment of policy P2-1399.

On January 6, 1982, in El Dorado case No. 34089, Puritan filed a first amended cross-complaint for declaratory relief against the Keenans and others. Therein, Puritan sought, among other things, a declaration of its rights and duties under policy H-2-2606 and policy P2-1399.

On March 1, 1982, El Monte and the Hueckels filed a motion for an order declaring the settlement to be in good faith.

On April 6, 1982, the Keenans filed a motion to set aside the settlement with El Monte under Code of Civil Procedure section 877.

On April 22, 1982, El Dorado case No. 34089 which included the Keenans' cross-complaint and Puritan's first amended cross-complaint, was added to Judicial Council Coordination Proceeding No. 799. Trial on the coverage issues raised in Puritan's amended cross-complaint was scheduled for June 18, 1982. The trial court continued the hearing on the Keenans' motion to set aside pending a resolution of the coverage issues. The motion of El Monte and the Hueckels for a determination that the settlement was made in good faith was also continued to June 18, 1982.

On June 1, 1982, Puritan filed a motion for summary adjudication of issues. Therein, it moved the trial court for an order adjudicating the following issue to be "without substantial controversy and as deemed established" against the Keenans: "That PURITAN airport liability insurance policy, number P2-1399, issued to EL MONTE FLIGHT SERVICE (hereinafter 'EL MONTE'), does not provide coverage or indemnification for the negligent entrustment of an aircraft to a rentor pilot or for the negligent training of a rentor pilot."

Puritan noted that the above issue served as the sole basis for the Keenans' allegations (1) that Puritan committed fraud and misrepresentation by failing to state that policy P2-1399 provided coverage for the negligent training of and the negligent entrustment of the aircraft to the pilot and (2) that the settlement made on behalf of El Monte and the Hueckels was made in bad faith. Puritan also moved for a corresponding order "striking the fraud and

misrepresentation cause of action from the cross-complaint of the KEEN-ANS" and for an order affirming that the settlement on behalf of EL MONTE and the HUECKELS was made in good faith. It was Puritan's position that if the trial court found that policy P2-1399 did not provide coverage for negligent entrustment and training, then the Keenans' allegations of fraud and misrepresentation and bad faith would be without merit.

On June 18, 1982, a hearing on Puritan's motion for summary adjudication of issues was held. Testimony was taken, and the matter was taken under submission. The trial date which originally had been set for June 18, 1982, and which had been reset for June 28, 1982, was advanced, vacated and reset for October 4, 1982.

In a minute order dated July 2, 1982, the trial court, in ruling that policy P2-1399 did provide coverage for negligent entrustment, training and repair and for products liability, stated:

"Puritan contends that the Aircraft Policy H-2-26-06 [sic] and the Airport Policy which were purchased concurrently and were not intended to provide overlapping coverage should be read together so that no overlapping coverage will be provided. The history of aircraft insurance and the testimony of Puritan's experts confirm that intent, but the language of the policies is not that clear, and it is to that languange [sic] we must look. The policies must be interpreted as they would be by reasonably intelligent laymen of ordinary comprehension, and not as they are interpreted by experts who know the history and read that into the language of the policies.

"Puritan's claim that because coverage is provided by the Aircraft Policy for all four of the allegations made by Keenans, there is no such coverage under the Airport Policy. The language of the Policy does not sustain that claim. The Airport Policy must be read by itself and the exclusions reasonably interpreted do not exclude negligent entrustment, training or repair, and do not exclude product liability.

"The Court determines there is coverage for negligent entrustment, training and repair and for product liability."

The trial court also granted the Keenans' motion to set aside the settlement as to both El Monte and the Hueckels since there had been no apportionment of the amount between El Monte and the Hueckels. The granting of the Keenans' motion to set aside the settlement was, however, conditioned on the return of the $100,000 within 10 days. The trial court, in its minute order of July 2, 1982, also denied the motion of El Monte and the Hueckels to confirm that the settlement had been made in good faith.

On August 13, 1982, a judgment encompassing the trial court's rulings of July 2, 1982, was entered. Puritan appealed, and the Keenans cross-appealed. Said appeal and cross-appeal were designated 2d Civil No. 69854.

On January 18, 1983, El Monte, having been sued as Doe 1, and the Hueckels, having been sued as Does 2 and 3, in El Dorado case No. 34089 demurred to the Keenans' June 25, 1981, cross-complaint for declaratory relief and damages on the ground that it failed to state facts sufficient to constitute a cause of action.

In their opposition to the demurrer of El Monte and the Hueckels, the Keenans conceded that the demurrer should be sustained as to the first and third causes of action of their cross-complaint for declaratory relief and damages. As to the second cause of action, however, the Keenans maintained that they had set forth facts sufficient to state a cause of action for fraud and misrepresentation against El Monte. The Keenans also stated that it was their intent to file a dismissal without prejudice as to the Hueckels at the hearing on the demurrer. This they did on March 25, 1983. On March 29, 1983, the order dismissing the Keenans' cross-complaint for declaratory relief and damages pursuant to California Rules of Court, rule 1545, as to the Hueckels only, was entered.

On April 22, 1983, the trial court sustained El Monte's demurrer to the Keenans' cross-complaint without leave to amend and dismissed the action pursuant to Code of Civil Procedure section 581 as to El Monte.

On May 25, 1983, the Keenans filed an appeal from the trial court's April 22, 1983, order "sustaining demurrer to cross-complainants' cross-complaint for declaratory relief and damages . . . ." Said appeal was designated 2d Civil No. B008269.

On June 21, 1984, this court ordered Puritan to show cause why its appeal in 2d Civil 69854 should not be dismissed as violative of the final judgment rule and to submit a supplemental brief on the subject. It appeared that the fraud and misrepresentation and bad faith claims asserted against Puritan and set forth in the Keenans' cross-complaint filed on June 25, 1981, still remained to be litigated.

In its supplemental brief Puritan informed this court that *the following transpired after the notice of appeal and the notice of cross-appeal in 2d Civil No. 69854 were filed:*

On October 11, 1983, Southern Marine & Aviation, Inc. (hereafter Southern Marine) and Puritan filed a motion for summary judgment wherein they

sought entry of summary judgment on the cross-complaint of the Keenans. Neither was named as a cross-defendant except in the first and second causes of action. The Keenans in their opposition to the summary judgment motion expressly stated that they would not address the summary judgment motion as it related to their first cause of action for declaratory relief which they did not intend to pursue.

On October 18, 1983, cross-defendants John Owens (hereafter Owens), a liability claims adjuster for Peter J. McBreen & Associates who had responsibility for adjusting the liability losses arising from the crash, James I. Michaelis (hereafter Michaelis), the attorney from Hart & Michaelis who had the primary responsibility for representing Puritan, and Hart & Michaelis, the law firm that represented Puritan in these proceedings, having been served as Does 7, 8 and 9, respectively, filed a demurrer to the Keenans' cross-complaint for declaratory relief and damages therein alleging that "[t]he entire cross-complaint" and the first and second causes of action "[fail] to state facts sufficient to constitute a cause of action against these demurring cross-defendants." Owens, Michaelis, and Hart & Michaelis, were named as cross-defendants in only the first two of the three causes of action set forth by the Keenans in their cross-complaint. The Keenans did not oppose the demurrer to the first cause of action.

On November 22, 1983, the motion for summary judgment of Southern Marine and Puritan was granted, and the demurrer of Owens, Michaelis, and Hart & Michaelis was sustained without leave to amend. In its minute order of November 22, 1983, the trial court stated:

"The motion for summary judgment is granted. This ruling is based on the same reasoning as the prior rulings, i.e., that the failure to return the $100,000 precludes the Keenans from seeking further damages. *This court has never determined the factual issue of whether there was fraud.* Without determining that issue the court found coverage, and that the motion to confirm the settlement should be denied and the motion to set aside granted on condition that the $100,000 be returned. There is no factual issue left to be determined and cross-defendants are entitled to summary judgment. The same reasoning compels the court to sustain the demurrers without leave to amend." (Italics added.)

On December 16, 1983, pursuant to Code of Civil Procedure section 437c, judgment in favor of Puritan and Southern Marine and against the Keenans was entered in El Dorado Superior Court Case No. 34089. On the same date, December 16, 1983, in the same case, a separate judgment of dismissal was entered as to Owens, Michaelis, and Hart & Michaelis, their demurrer having been sustained without leave to amend.

On January 20, 1984, the Keenans filed a notice of appeal from the trial court's order of "November 22, 1983, granting cross-defendant's motion for summary judgment on cross-complaint for declaratory relief and damages . . . ." This appeal was designated 2d Civil No. B008131.

On July 20, 1984, this court ordered that the appeal and cross-appeal in 2d Civil No. 69854 be consolidated with the appeal designated 2d Civil No. B008131. We further ordered that consideration of the appeal and cross-appeal designated 2d Civil No. 69854 be deferred until briefing had been completed in the appeal with which it had been consolidated. The order to show cause issued on June 21, 1984, was discharged.

On December 24, 1984, this court ordered that the appeal designated 2d Civil No. B008269 be consolidated with the appeals already consolidated by our order dated July 20, 1984.

We now proceed to address the merits of the claims raised by the parties.

## 2D Civil No. 69854

In the judgment entered on August 13, 1982, the trial court "ORDERED, ADJUDGED and DECREED that Puritan Policy Number P2-1399 affords coverage for negligent entrustment, training and repair and for product liability. That the motion to confirm the prior settlement is denied, and that the motion to set aside is granted upon the condition that the KEENANS return the One Hundred Thousand Dollars ($100,000.00) previously paid by Puritan Insurance Company on behalf of NORMAN and DIXIE HUECKEL and EL MONTE FLIGHT SERVICE within ten (10) days of July 2, 1982."

In its appeal from this judgment, Puritan contends (1) that policy P2-1399 clearly excluded coverage for the negligent entrustment, maintenance or repair, and training and products liability allegations contained in the Keenans' complaint because the accident aircraft was hired by and in flight for the account of the insured and, therefore, excluded from coverage, and (2) that neither the insured nor the insurer had any reasonable expectation that the allegations contained in the Keenans' complaint would be covered by policy P2-1399.

The Keenans, in their cross-appeal from the judgment entered on August 13, 1982, contend solely that California law does not require the return of consideration as a precondition to rescission of a release where the release was induced by fraud, deceit or misrepresentation.

*Puritan's Appeal*

Does policy P2-1399 afford coverage to El Monte for the Keenans' allegations of negligent entrustment, negligent instruction, negligent maintenance and products liability arising from the crash of the accident aircraft? We shall conclude that coverage is excluded in this case.

Puritan concedes that policy H-2-2606 provides coverage for the Keenans' allegations and therefore argues that policy P2-1399 does not. In this respect, Puritan maintains that the policies are mutually exclusive and should be read together so that no overlapping coverage is afforded.

In support of its position, Puritan directs us to oral testimony given at the hearing on their motion for summary adjudication of issues which establishes that both El Monte and Puritan subjectively intended and expected that any occurrence involving an aircraft leased back to El Monte and rented out would be covered by policy H-2-2606, not policy P2-1399 and that the policies were not intended to provide overlapping coverage.

Even were we to agree that both policies might be considered together that would not mean that they are necessarily mutually exclusive. A finding of coverage under one policy would not automatically necessitate a finding of no coverage under the other. Additionally, the reasonable expectations to be considered are those of the ordinary lay person and are to be ascertained from the language of the policies, not from the subjective intent of the people who drew up those policies of adhesion.

The Keenans argue that if the policies are read together, policy H-2-2606 does not provide coverage to El Monte for products liability claims and, therefore, policy P2-1399 does.

In arguing that policy H-2-2606 does not provide coverage for products liability claims arising from the crash of the accident aircraft, the Keenans direct our attention to endorsement No. 8 of policy H-2-2606. Endorsement No. 8 which is entitled "NON-OWNED AIRCRAFT HULL AND LIABILITY ENDORSEMENT" provides that in consideration of an additional premium, the insurance coverage afforded by policy H-2-2606 "is extended to include non-owned fixed aircraft." The endorsement specifies that it "only applies to aircraft now [*sic;* not] owned in whole or in part by, or leased under a long-term lease or lease-option purchase agreement by the Named Insured." It further specifies that it "shall not apply to liability arising out of any product manufactured, sold, handled or distributed by the Named Insured."

The Keenans, relying on this exclusionary language, contend that policy H-2-2606 excludes coverage for products liability claims. We disagree.

Since El Monte leased the accident aircraft from the Hueckels it does not fall within the definition of a nonowned aircraft. Hence, the products liability exclusion of endorsement No. 8 does not govern in this case, and policy H-2-2606 which provides bodily injury and property damage liability coverage to persons, including passengers, "caused by an occurrence and arising out of the ownership, maintenance or use" of the accident aircraft provides coverage for the Keenans' allegations of products liability as well as their allegations of negligent entrustment, negligent instruction and negligent maintenance. We now proceed to determine if policy P2-1399 also provides coverage for these allegations.

Puritan policy P2-1399 was effective from July 1, 1977, through July 1, 1978. The declarations page of said policy indicated that El Monte was insured against liability for division 1 and division 2 hazards under coverage C—"Single Limit Bodily Injury and Property Damage Liability." Puritan's limit of liability was $1 million.

With respect to coverage C, the insuring agreement provides that the insurer agrees with the insured "[t]o pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages

"(1) including damages for care and loss of services, because of bodily injury, sickness, disease and, if arising out of the foregoing, mental anguish, including death at any time resulting therefrom, sustained by any person, and

"(2) For injury to or destruction of tangible property, including the loss of use thereof, *caused by accident and arising out of hazards hereinafter defined.*" (Italics added.)

Policy P2-1399 defines division 1 hazards which are entitled "Airport-Operations" as "[t]he ownership, maintenance or use of the airport, and all operations necessary thereto."

The declarations page of policy P2-1399 expressly made division 2 of the divisions of hazards which is entitled "PRODUCTS—COMPLETED OPERATIONS [¶] (Applicable only with respect to the following classification[s])

"New Aircraft Sales

"Used Aircraft Sales

"Aircraft Repairs & Service

"Aircraft Parts & Accessories (not installed)"

Division 2 hazards are defined as follows:

"(1) Goods or products manufactured, sold, handled or distributed by the Named Insured if the occurrence or accident occurs after possession of such goods or products has been relinquished to others by the Named Insured.

"(2) Service operations of the Insured, if the occurrence or accident takes place after service operations have been completed or abandoned provided operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to a service or maintenance agreement."

Under the heading of "EXCLUSIONS" policy P2-1399 stated: "THIS POLICY DOES NOT APPLY (a) to the existence, maintenance, operation, use, loading or unloading of aircraft owned by, hired by or for, or loaned to the Insured, or in flight by or for the account of the Insured."

Appellant Puritan maintains that exclusion (a) of policy P2-1399 excludes coverage for the allegations of negligent entrustment, instruction and maintenance, and products liability set forth in the Keenans' complaint for personal injuries because the accident aircraft which Tobin was flying was hired by and in flight for the account of El Monte.

The Keenans do not quarrel with Puritan's contention that the aircraft was hired by and in flight for the account of the insured. Nor do they contend on appeal that exclusion (a) is ambiguous or inapplicable. They simply maintain that policy P2-1399 provides coverage in this case. With regard to El Monte's alleged negligent entrustment and instruction, the Keenans assert that each is an independent concurrent cause of the accident and that therefore under *State Farm Mut. Auto. Ins. Co.* v. *Partridge* (1973) 10 Cal.3d 94 [109 Cal.Rptr. 811, 514 P.2d 123], coverage is provided for these allegations despite exclusion (a). The Keenans do not discuss the effect of exclusion (a) on their products liability and negligent maintenance claims.

Policy P2-1399's declarations page, its insuring agreement relating to coverage C and its definition of division 2 hazards clearly and unambiguously demonstrate that said policy provides coverage to El Monte for products liability claims stemming from the sales of new or used aircraft and

uninstalled aircraft parts and accessories[1] and for claims arising from the negligent or defective maintenance or service of an aircraft by El Monte.

Even were we to assume that the broad language of the definition of division 1 hazards extends coverage to El Monte for liability arising from its negligent entrustment of an aircraft to a rentor pilot and its negligent instruction of a pilot, we must nevertheless conclude that coverage to El Monte for negligent entrustment, negligent instruction, negligent maintenance and products liability is expressly precluded in this particular case by virtue of the clear and unambiguous language of exclusion (a). This is so because, as distinguished from *State Farm Mut. Auto. Ins. Co.* v. *Partridge, supra,* 10 Cal.3d 94, any potential liability to El Monte for such claims stems exclusively from the use and operation of the accident which, as we will explain, is an excluded instrumentality under exclusion (a).

Puritan has not directed our attention to and our own independent research has not disclosed any California cases construing an exclusion in an aviation insurance policy similar to exclusion (a).

A similar exclusion in an aviation products liability policy was, however, construed by the Supreme Court of Washington in *Boeing Airplane Co.* v. *Firemen's Fund Indemnity Co.* (1954) 44 Wn.2d 488 [268 P.2d 654, 45 A.L.R.2d 984]. Boeing undertook to modify a B-50 bomber in accordance with a cost-plus fixed fee contract.

On August 10, 1951, Boeing believed that it had completed the modification work on the B-50 bomber. Before it would be accepted by the government it had to have a test flight. That test revealed that certain additional repairs were required, and the pilot's report called for another test flight after completion of those repairs.

On August 13, 1951, after Boeing had made the required repairs, the plane was taken out for a second test flight. Two minutes after take off, the plane crashed into an apartment building "causing death or injury to persons and destruction or damage to property." (*Boeing Airplane Co.* v. *Firemen's Fund Indemnity Co., supra,* 268 P.2d at p. 657.)

---

[1]As per the definition of division 2 hazards, policy P2-1399 provides coverage for products liability only "if the occurrence or accident occurs after possession of such goods or products has been relinquished to others by the Named Insured."

Puritan argues that El Monte had not relinquished possession of the accident aircraft to Tobin because El Monte retained a leasehold interest in the accident aircraft during the actual rental period. Puritan's attempt to equate relinquishment of possession with an abandonment of an ownership or leasehold interest must fail. El Monte clearly relinquished possession of the aircraft to Tobin during the rental period. As we shall explain, coverage is nevertheless precluded in this case.

At the time of this crash Boeing was covered against aviation-related risks by products liability policies issued by Firemen's Fund Indemnity Company and United States Fidelity and Guarantee Company and by aviation liability policies issued by Eagle Star Insurance Company, Ltd. and American Fidelity and Casualty Company.

The Supreme Court of Washington described the products liability policies as follows:

"The policies obligated the products insurers to pay to Boeing such sums as it might become obligated to pay to third persons as damages because of any accident arising out of hazards which were defined in the policies in these terms:

" 'The handling of, the operation of, the use of, a warranty of, or the existence of any condition in, . . . *aircraft products* manufactured, sold, assembled, repaired, serviced, handled or distributed by the named insured . . ., *if the accident occurs after the Insured has relinquished possession thereof to others and away from premises owned, exclusively rented or controlled by the Insured.*' (Italics ours.)

"The policies also provided:

" 'This policy does not apply:

" '(a) To the maintenance or use of any aircraft . . . *in flight by or for the account of the insured.*' (Italics ours.)"

The aviation liability policies required "the insurers to pay to Boeing such sums as it should become obligated to pay as damages because of an accident arising out of the ownership, maintenance or use of aircraft. The policies described the aircraft covered thereby in this language:

" '5. Aircraft covered:

" 'This Policy shall automatically attach and apply with respect to any aircraft which is owned or operated by or in the possession of the Named Insured, . . . *but excluding Products Liability claims.*' (Italics ours.)" (*Boeing Airplane Co.* v. *Firemen's Fund Indemnity Co., supra,* 268 P.2d at p. 656.)

The parties stipulated "that the phrase 'but excluding Products Liability Claims' was intended to exclude all claims covered by the products liability policies, the result being that the coverage afforded by the two types of

policies is mutually exclusive." (*Boeing Airplane Co.* v. *Firemen's Fund Indemnity Co., supra,* 268 P.2d at p. 656.)

The four insurance companies instituted a lawsuit to determine which of the two mutually exclusive types of policies provided insurance coverage to Boeing for the losses resulting from the crash of the B-50 bomber.

The trial court found that Boeing had not relinquished possession of the plane at the time of the crash, that the loss was covered by the aviation liability insurance policies and that at the time of the crash, the plane was " 'in flight by or for the account of the plaintiff [Boeing].' "

In discussing the meaning of the word "account" as used in exclusion (a) of the products liability policies, the Supreme Court of Washington stated, "The word 'account' as used in the products policies means for the advantage, profit or benefit of Boeing." The court then rejected the argument that the flight was solely for the benefit of the government noting: "Boeing could not be paid in full until the plane had been successfully test flown, thereby demonstrating that the work had been completed in accordance with the contract. The successful completion of a test flight would result in a direct financial benefit to Boeing. That being the case, the flight was 'by or for and on account of Boeing.' " (*Boeing Airplane Co.* v. *Firemen's Fund Indemnity Co., supra,* 268 P.2d at p. 661.)

El Monte sold the accident aircraft to the Hueckels when it was new. They, in turn, leased it back to El Monte. As part of its business operations, El Monte rented the accident aircraft to rentor pilots.

On July 21, 1977, El Monte rented the accident aircraft to Tobin for the period of July 21 to July 24, 1977. The accident aircraft crashed shortly after takeoff on July 24, 1977, during that rental period. These facts established that at the time of the crash, the accident aircraft was "in flight by or for the account of the insured." We therefore need not decide whether said aircraft was also "hired by" El Monte within the meaning of exclusion (a) at the time of the crash.

The query remaining is whether the allegations of negligent entrustment, negligent instruction, negligent maintenance and products liability are excluded because they involve the "existence, maintenance, operation, use, loading or unloading" of the accident aircraft. Cases construing similar phrases in automobile exclusions contained in homeowner's policies provide guidance.

*Negligent Entrustment & Negligent Flight Instruction*

In reliance on *State Farm Mut. Auto. Ins. Co.* v. *Partridge, supra,* 10 Cal.3d 94, the Keenans contend that El Monte's negligent entrustment of the accident aircraft to Tobin, as well as its negligent instruction of Tobin, is an independent concurrent cause of the air crash and that, therefore, despite exclusion (a), policy P2-1399 provides coverage for these allegations.

In *Partridge,* the insured negligently filed the trigger mechanism of a gun so that it would have hair trigger action. During a hunting trip the insured negligently drove his vehicle off the paved road onto the terrain. The modified gun discharged when the vehicle hit a bump. The bullet hit a passenger who was seriously injured. The passenger brought a suit for damages against the insured. (*State Farm Mut. Auto. Ins. Co.* v. *Partridge, supra,* 10 Cal.3d at pp. 97-98.)

At the time of the accident, the insured had an automobile liability policy and a homeowner's policy. The latter contained an exclusionary clause excluding insurance coverage for " 'bodily injury . . . arising out of the . . . use of . . . any motor vehicle, . . .' " (*State Farm Mut. Auto. Ins. Co.* v. *Partridge, supra,* 10 Cal.3d at p. 99.)

The issue before the *Partridge* court was whether the homeowner's policy applied to the accident; no one disputed that the automobile liability policy applied. The *Partridge* court concluded that when an accident is jointly caused by an insured risk (negligent filing of trigger mechanism) and an excluded risk (negligent driving), the insurer is liable so long as one of the independent concurrent proximate causes of the accident is covered by the policy and that, therefore, the insured's homeowner's policy extended coverage to the accident. (*State Farm Mut. Auto. Ins. Co.* v. *Partridge, supra,* 10 Cal.3d at p. 102.)

While not denying that the insured's negligence in filing down the trigger mechanism was covered by his homeowner's policy, the insurer in *Partridge* maintained that coverage was nevertheless precluded because the accident arose out of the use of an automobile. The *Partridge* court rejected this argument stating, "although the accident occurred in a vehicle, the insured's negligent modification of the gun suffices, in itself, to render him fully liable for the resulting injuries. Under these facts the damage to Vanida are, under the language of the homeowner's coverage clause, 'sums which the Insured . . . [became] legally obligated to pay' because of the negligent filing of the trigger mechanism; inasmuch as the *liability of the insured arises from his non-auto-related conduct, and exists independently of any*

*'use' of his car,* we believe the homeowner's policy covers that liability." (*State Farm Mut. Auto. Ins. Co.* v. *Partridge, supra,* 10 Cal.3d at p. 103; italics added.)

The Keenans' reliance on *Partridge* is misplaced for *Partridge* is clearly distinguishable from the case before us. With regard to the Keenans' allegations of negligent entrustment and negligent training, we shall explain that El Monte's potential liability does not exist independently from the use and operation of the accident aircraft.

*Negligent Entrustment*

In *Safeco Ins. Co.* v. *Gilstrap* (1983) 141 Cal.App.3d 524 [190 Cal.Rptr. 425], the Gilstraps permitted their son Donald who was serving in the Navy and stationed away from home to store his motorcycle in their garage. One day, Michael, the Gilstraps' youngest son, removed the motorcycle from the garage and took a passenger for a ride. The passenger was injured when the motorcycle driven by Michael collided with another motorcycle. The passenger in her suit against the Gilstraps included a cause of action for negligent entrustment of the motorcycle to Michael.

The Gilstraps' homeowner's policy excluded coverage for " 'bodily injury or property damages arising out of the ownership, maintenance, operation, use, loading or unloading of . . . any motor vehicle owned or operated by, or rented or loaned to any insured . . . .' " (*Safeco Ins. Co.* v. *Gilstrap, supra,* 141 Cal.App.3d at p. 526.)

The question before the *Gilstrap* court was whether the Gilstraps' negligent entrustment of a motorcycle to their son existed independently of the operation and use of that motorcycle.

In distinguishing *Partridge,* the court in *Gilstrap* stated: "The separate and independent act in *Partridge* giving rise to liability was a 'non-auto-related act,' i.e., the filing of the gun trigger. That act had nothing to do with the use or operation of a vehicle. In contrast to *Partridge,* the obligation of the insureds in this case did not arise from an act separate and independent from the use of the vehicle itself. The conduct of the Gilstraps in negligently entrusting the vehicle to their minor son was an act separate only in the fact that it preceded the collision. This conduct cannot be disassociated from the use of the vehicle itself. Conduct which is dependent upon and related to the use of the vehicle cannot be deemed an independent act of a homeowner under the homeowner's coverage as provided in the policy. [Citations.]" (*Safeco Ins. Co.* v. *Gilstrap, supra,* 141 Cal.App.3d at pp. 527-528.)

The *Gilstrap* court then concluded that coverage for negligent entrustment of the motorcycle was excluded under the Gilstraps' homeowner's policy stating: "The liability of the insureds here both arises from their auto-related conduct (entrustment of the motorcycle) and did not exist independently of any use of the motorcycle. Until their son incompetently operated and used the motorcycle and caused injury, no liability against the entrusters arose. 'Under the theory of "negligent entrustment," liability is imposed on the vehicle owner or permitter because of his own independent negligence and not the negligence of the driver, in the event plaintiff can prove that the injury or death resulting therefrom was proximately caused by the driver's incompetency.' (*Syah* v. *Johnson* (1966) 247 Cal.App.2d 534, 539 [55 Cal.Rptr. 741].) While the Gilstraps may have joint responsibility for the injuries caused by Michael under general negligence principles based on the stated facts [citation], their homeowner's insurer does not. . . . [T]he insurance policy does not purport to regulate the theory of liability or the standard of causation, but only to specify the events upon which an otherwise covered liability is excluded (i.e., the 'operation, use . . . of . . . any motor vehicle') and to broadly link them to the damage complained of by the phrase 'arising out of.' ■ In short, *when the events giving rise to the insured's liability are solely and indivisibly related to the use of an excluded instrumentality, coverage is precluded.* [¶] As the injury here involved no instrumentality other than the vehicle itself and as there would have been no accident without the use or operation of the motorcycle, we hold the cause of action for negligent entrustment, under the facts present, is expressly excluded under the terms of the policy." (*Safeco Ins. Co.* v. *Gilstrap, supra,* 141 Cal.App.3d at pp. 530-531; italics added.)

■ The *Gilstrap* court's reasoning is directly applicable in the matter before us. Any potential liability of El Monte for negligent entrustment of the accident aircraft to Tobin cannot exist independently of the negligent use and operation of the same by Tobin. The crash involved no instrumentality other than the accident aircraft, and there would have been no crash in the absence of the use or operation of the accident aircraft. Because the accident aircraft was "in flight by or for the account of the Insured" and was, therefore, an excluded instrumentality, there can be no coverage based on the negligent entrustment of the same. We conclude, that coverage for El Monte's potential liability for negligent entrustment of the accident aircraft to Tobin is precluded by exclusion (a).

*Negligent Flight Instruction*

■ In *Hartford Fire Ins. Co.* v. *Superior Court* (1983) 142 Cal.App.3d 406 [191 Cal.Rptr. 37, 39 A.L.R.4th 189], the question before Division Three of this court was whether the homeowner's policy and excess indem-

nity policy issued by Hartford Fire Insurance Company and Hartford Accident and Indemnity Company (hereafter Hartford), respectively, provided coverage to Tobin's wife, Joann Tobin, individually and as the representative of her husband's estate, for numerous claims brought against her as a result of the crash of the accident aircraft on July 24, 1977. Each of these policies contained an aircraft exclusion which in essence precluded coverage for liability arising out of the operation and use of any aircraft.

One of the grounds on which Joann Tobin maintained that coverage was not excluded under the Hartford policies was the fact that her husband conducted his preflight planning at home the night before the crash. Division Three of this court rejected this contention and noted that "preflight planning cannot be an independent cause of injury in the present case." (*Hartford Fire Ins. Co.* v. *Superior Court, supra,* 142 Cal.App.3d at p. 415.) The court explained that "preflight planning is a part of the 'operation' and 'use' of an aircraft and therefore comes within the exclusion. Whether the planning is performed at home, on the airplane, or at some other location, it is simply a necessary part of operating the aircraft." (*Ibid.*)

With regard to Tobin's consumption of alcohol and preflight representations, the *Hartford* court concluded: "Consumption of alcohol before the flight also does not cause any injury which is independent of the 'operation' and 'use' of an aircraft. Consuming alcohol is not, alone, negligent. It is only the act of piloting a plane while intoxicated that causes injuries or gives rise to an accident. Any damages caused while operating the aircraft under the influence of alcohol were wholly dependent on the aircraft operation. [¶] Likewise, any preflight representations made by Thomas Tobin about his experience as a pilot were not an independent cause of injuries. Without the aircraft operation and the crash, any such representations would have been mere harmless words. Representations about piloting ability cannot properly be characterized as 'independent, concurring proximate' causes of the injuries, within the holding of [*Partridge*]." (*Hartford Fire Ins. Co.* v. *Superior Court, supra,* 142 Cal.App.3d at p. 415.) We agree and conclude that since there can be no liability for negligent training in the absence of the use and operation of an aircraft, exclusion (a) is applicable.

A cause of action for negligent training requires a showing that El Monte negligently trained Tobin to operate and fly and as a result of such negligent instruction, Tobin, when flying, caused injury or damage to another. Hence, any liability of El Monte for negligent instruction is wholly dependent upon and exclusively related to the use and operation of an aircraft. If El Monte had negligently taught Tobin how to fly but Tobin had never used or operated an aircraft no liability for negligent flight instruction would ever attach. We conclude, that the fact that Tobin was flying an excluded instrumentality

at the time of the crash precludes coverage for the Keenans' allegation of negligent flight instruction.

The Keenans contend that "[i]f P2-1399 insured El Monte for liability arising out of their negligent instruction of pilot Tobin, then indemnification attaches under the policy the moment a legally enforceable claim for damages arises as a proximate result of such negligence regardless of which aircraft was involved." They urge that "[e]xclusion A does not preclude coverage under P2-1399 for this occurrence because the existence of the negligent act giving rise to plaintiff's cause of action did not depend upon Tobin's selection of an aircraft in which the insured had a pecuniary interest. An insurance provision which ostensibly provides coverage for liability arising from acts whose liability-producing effect is not dependent upon the existence of conditions subsequent cannot be limited ex post facto because of the occurrence of subsequent acts, which, had they been the sole proximate cause of the damages complained of, would have been excluded under the terms of the insuring agreement. To do so would preclude the contract from becoming a binding agreement until after the risk insured against and all possible events in the chain of proximate cause had occurred, rendering the contract illusory and incapable of enforcement without litigation. In order to prevent an integrated contract of insurance from becoming illusory, coverage for the risks insured against must not be dependent upon a condition subsequent whose occurrence is merely fortuitous. If P2-1399 provided coverage to El Monte for negligent training at all, such coverage cannot be denied because Tobin chose to rent an airplane from El Monte, rather than from another source."

These contentions are without merit. If we were to agree with the Keenans' argument that coverage for "the risks insured against must not be dependent upon a condition subsequent whose occurrence is merely fortuitous" any exclusion whose applicability was triggered by the use of an excluded instrumentality would be rendered ineffective. Whether policy P2-1399 would have provided coverage to El Monte for negligent instruction if Tobin had rented an aircraft from another source is a question we need not and therefore do not decide.

As the *Gilstrap* court noted, "the insurance policy does not purport to regulate the theory of liability or the standard of causation, but only to specify the events upon which an otherwise covered liability is excluded (i.e., the 'operation, use . . . of . . . any motor vehicle') and to broadly link them to the damage complained of by the phrase 'arising out of.' In short, when the events giving rise to the insured's liability are solely and indivisibly related to the use of an excluded instrumentality, coverage is precluded." (*Safeco Ins. Co.* v. *Gilstrap, supra,* 141 Cal.App.3d at p. 530.)

El Monte's liability for negligent instruction does not depend on Tobin's *selection* of a particular aircraft. It does, however, depend on his use and operation of an aircraft. This is the operative fact which precludes a finding that negligent flight instruction was an independent concurrent proximate cause of the crash.

## Negligent Maintenance

■ Exclusion (a) expressly states that the coverage afforded by policy P2-1399 does not extend to the "maintenance" of an aircraft "in flight by or for the account of the Insured." Since we have already concluded that the accident aircraft is an excluded instrumentality, it necessarily follows that exclusion (a) precludes coverage for damages caused by El Monte's negligent maintenance, repair or service of the accident aircraft.

## Products Liability

■ The Keenans maintain that policy P2-1399 provides coverage for their products liability claims against El Monte "because such a claim does not arise out of the ownership, use, or maintenance of the aircraft, but instead results from the insured's status as a link in the chain of distribution . . . ." We disagree.

While policy P2-1399 provides coverage for products liability claims stemming from El Monte's sale of new and used aircraft and while El Monte did sell the accident aircraft to the Hueckels, products liability coverage is excluded in this case by virtue of exclusion (a).

In *State Farm Fire & Cas. Co.* v. *Camara* (1976) 63 Cal.App.3d 48 [133 Cal.Rptr. 600], a passenger was injured when the dune buggy which the insured had negligently designed and built overturned while the insured was driving on a deer hunting trip. The passenger sued the insured and, in an effort to obtain coverage under the insured's homeowner's policy, "alleged that Camara so negligently 'designed, constructed and assembled the vehicle as to proximately cause the vehicle to overturn.'" (*Id.*, at p. 50.)

The insured's homeowner's policy provided coverage for damages "'caused by an occurrence'" which was defined as "'an accident, including injurious exposure to conditions, which results, during the policy term, in bodily injury or property damage.'" (*State Farm Fire & Cas. Co.* v. *Camara, supra,* 63 Cal.App.3d at p. 53.) The policy, however, expressly excluded coverage for personal injuries and property damages "'. . . arising out of the ownership, maintenance, operation, use, loading or unloading of:

. . . (2) [a]ny motor vehicle owned or operated by, or rented, or loaned to any insured; . . .'" (*Ibid.*)

In concluding that there was no coverage under the insured's homeowner's policy, the *Camara* court stated: "It is undisputed that the vehicle was at all times owned by Camara; hence the work of design, construction and assembly necessarily arose out of its 'ownership.' Most certainly such work arose out of the vehicle's 'use.' 'The term is not confined to motion on the highway, but extends to any activity in utilizing the insured's vehicle in the manner intended or contemplated by the insured.' [Citations.]" (*State Farm Fire & Cas. Co.* v. *Camara, supra,* 63 Cal.App.3d at pp. 53-54.)

The *Camara* court went on to note that there would be no coverage even if the asserted cause of the accident—negligent design and construction of the dune buggy—were not considered as involving the ownership, maintenance, operation, or use of the vehicle. The court explained: "[T]he injury in the instant case did not involve an instrumentality other than and separate from the vehicle itself. Under the undisputed facts, the accident would not have happened *but for* the defendant's design and construction of the dune buggy. But it does not follow that the accident did not *arise out of the operation or use of* a motor vehicle. The facts show the contrary. As *Partridge* held, the nonvehicle-related cause must be independent of the vehicle-related cause in order for the liability to be covered by the homeowner's policy. Although the operation or use of the dune buggy was not the sole cause of the accident, any contributing *design* cause was dependent upon such operation or use, such that any liability for negligent design necessarily arose out of the operation or use of the motor vehicle. [¶] In other words, the *only* way in which plaintiff could have been exposed to the claimed design risk was through the operation or use of the motor vehicle. Under such circumstances defendant's asserted liability could not but arise out of the ownership, maintenance, operation or use of the vehicle; it was therefore excluded." (*State Farm Fire & Cas. Co.* v. *Camara, supra,* 63 Cal.App.3d at pp. 54-55; fn. omitted, italics in original.)

The reasoning of the *Camara* court is equally applicable in this case. In their complaint, the Keenans alleged that as a result of certain air and crash worthiness defects and lack of warning thereof, the accident aircraft "failed to perform as safely as an ordinary consumer would expect when *used* in an intended or reasonably foreseeable manner and suddenly and without warning crash [*sic*] near the vicinity of the South Lake Tahoe airport" while in the process of taking off. (Italics added.)

This allegation directly emphasizes that the Keenans' products liability claims against El Monte are directly related to and dependent upon the use

and operation of the accident aircraft. Mr. Keenan could only have been exposed to the defects in the accident aircraft, which he alleged caused it to crash, while it was being used or operated. Since El Monte's claimed products liability could not arise independently of the use or operation of the accident aircraft, insurance coverage for such liability is excluded by virtue of exclusion (a) of policy P2-1399.

■ ■■■ Any coverage under that policy to which El Monte might have been entitled for products liability in its capacity as the seller and retailer of a defective product[2] is excluded in this case because El Monte leased the accident aircraft back from the Hueckels, rented it out and because at the time of the crash, the accident aircraft was in flight for the account of El Monte.

### Keenans' Cross-appeal

The trial court's decision to grant the Keenans' motion to set aside the settlement was solely premised on its finding that policy P2-1399 provided coverage for the Keenans' allegations of negligent entrustment, instruction and maintenance and products liability.

In light of our contrary conclusion and insofar as the basis for the Keenans' motion was the applicability of policy P2-1399 to this crash, we conclude that the trial court erred in granting the Keenans' motion to set aside the settlement. Hence, we need not, and do not, decide whether restoration of consideration is a prerequisite to rescission of a release that was induced by fraud, deceit or misrepresentation. In fact, in this case, the trial court made clear, it did not decide the issue of fraud.

### 2D Civil No. B008269

The April 22, 1983, order sustaining El Monte's demurrer to the Keenans' cross-complaint for declaratory relief and damages from which the Keenans appeal is not appealable. We, therefore, liberally construe the Keenans' notice of appeal from that order as a notice of appeal taken from the order of dismissal also entered on April 22, 1983, dismissing the Keenans' cross-complaint as to El Monte. (See *Vibert* v. *Berger* (1966) 64 Cal.2d 65, 67-68 [410 P.2d 390].)

---

[2]"Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products." (*Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 262 [37 Cal.Rptr. 896, 391 P.2d 168].) Hence, a retailer engaged in the business of distributing goods to the public is strictly liable in tort for personal injuries caused by defects in the products which it sells. (*Id.*, at p. 263.)

The Keenans contend that (1) a complaint will withstand demurrer if it appears from the facts that the plaintiff is entitled to any judicial relief against the defendant and (2) where a release is pled as a bar to litigation, the party against whom the release purports to operate is entitled to attack the validity of the release in a subsequent proceeding.

Because the Keenans conceded in the trial court that El Monte's demurrer should be sustained as to the first and third causes of action of their June 25, 1981, cross-complaint, the issue in this appeal involves only the propriety of the dismissal of the second cause of action for fraud and misrepresentation which dismissal was entered after the trial court sustained El Monte's demurrer to said cause of action without leave to amend.

■ In their second cause of action for fraud and misrepresentation, the Keenans alleged in part that from the beginning of the litigation arising from the air crash, Puritan and El Monte represented that El Monte "had a total limit of liability insurance coverage applicable to any injuries or damages sustained by [the Keenans] of no more than One Hundred Thousand Dollars ($100,000)."

The Keenans also alleged that during their settlement negotiations with El Monte, El Monte represented in writing that the total amount of insurance coverage afforded to it was $100,000 and that Puritan and El Monte intended the Keenans to rely on, or knew or should have known that the Keenans would rely on, said representation.

The Keenans then further alleged that they relied on Puritan's and El Monte's representation regarding the $100,000 limit of liability, that in reliance thereon settled their claims against El Monte for $100,000 whereas "had [they] known that the amount of insurance coverage was greater, then [they] would have only agreed to settle their claims for the full amount of that insurance coverage."

The Keenans then alleged that on or about June 18, 1981, they learned for the first time that El Monte had liability insurance coverage in an amount in excess of $100,000 and that as a direct and proximate result of Puritan's and El Monte's conduct they have been damaged by settling their claims against El Monte for a sum less than the full amount of insurance coverage available to El Monte.

El Monte demurred to the second cause of action on the ground that it failed to state facts sufficient to constitute a cause of action for fraud and misrepresentation and alternatively on the ground that said cause of action is "defectively vague and ambiguous in that it fails to define and identify

the policies of insurance referred to therein." The trial court sustained El Monte's demurrer without leave to amend.

In *Roberts* v. *Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104, 109-110 [128 Cal.Rptr. 901], we stated that "[t]he essential allegations of an action for fraud are a misrepresentation, knowledge of its falsity, intent to defraud, justifiable reliance, and resulting damage. [Citation.] Every element of the cause of action for fraud must be alleged in the proper manner and the facts constituting the fraud must be alleged with sufficient specificity to allow defendant to understand fully the nature of the charge made. [Citation.]"

In reviewing the allegations of the Keenans' second cause of action in light of these legal principles, it quickly becomes apparent that the Keenans failed to sufficiently plead a cause of action for fraud and misrepresentation. At no time did the Keenans specifically allege that the representation made by El Monte and Puritan was false (they only intimate same) or that El Monte and Puritan knew their representation was false at the time it was made. (See *Universal By-Products, Inc.* v. *City of Modesto* (1974) 43 Cal.App.3d 145, 151 [117 Cal.Rptr. 525].) While the Keenans did allege that they actually relied on the representation made by El Monte and Puritan, they did not allege *justifiable* reliance since they did not allege that they believed the representation to be true or had no knowledge of its falsity or had no reason to question its truthfulness. (See *Younan* v. *Equifax Inc.* (1980) 111 Cal.App.3d 498, 513 [169 Cal.Rptr. 478].) The absence of these essential allegations renders the Keenans' second cause of action for fraud and misrepresentation defective, and therefore El Monte's general demurrer thereto was properly granted. Moreover, the trial court did not abuse its discretion in sustaining El Monte's demurrer without leave to amend since under applicable substantive law there is no reasonable possibility or probability the defect could be cured by amendment. (*Jack Heskett Lincoln-Mercury, Inc.* v. *Metcalf* (1984) 158 Cal.App.3d 38, 41 [204 Cal.Rptr. 355].) "[L]eave to amend is properly denied if the facts and nature of the plaintiffs' claims are clear and under the substantive law, no liability exists." (*Beck* v. *County of San Mateo* (1984) 154 Cal.App.3d 374, 379 [201 Cal.Rptr. 365].)

The nature of the Keenans' cause of action for fraud and misrepresentation is clear. Although in their second cause of action they did not describe the policies of insurance to which they were referring by policy number, it necessarily follows that the policy of insurance with liability insurance coverage in excess of $100,000 to which they refer is policy P2-1399 and that the policy with a limit of $100,000 upon the disclosure of which the settlement was premised was policy H-2-2606.

The Keenans' cause of action for fraud and misrepresentation is premised on their allegation that policy P2-1399 provided El Monte with liability coverage in excess of $100,000. From our conclusion in 2d Civil No. 69854 that policy P2-1399 excludes coverage for the claims arising from the subject air crash and is, therefore, inapplicable in this case, it follows as a matter of law that there was no actionable fraud or misrepresentation on the part of El Monte or Puritan in informing the Keenans that El Monte's limit of liability insurance coverage was $100,000. We conclude that because no liability for fraud and misrepresentation exists on the part of El Monte or Puritan, the Keenans cannot state a cause of action for fraud and misrepresentation against El Monte arising from its truthful representation. ██ ██ fn. ██ Consequently, we conclude that El Monte's demurrer was properly sustained without leave to amend.[3]

Whether the release would have precluded the Keenans from seeking damages from El Monte for fraud and misrepresentation if, assuming arguendo, there had, in fact, been actionable fraud and the law required restoration of consideration is a question we need not, and do not, reach.

## 2D CIVIL No. B008131

The Keenans appeal from the trial court's minute order of "November 22, 1983, granting cross-defendant's motion for summary judgment on the cross-complaint for declaratory relief and damages." Because an order granting a motion for summary judgment is not appealable (*Crookham* v. *Smith* (1977) 68 Cal.App.3d 773, 775, fn. 1 [137 Cal.Rptr. 428]), we liberally construe the Keenans' notice of appeal as one taken from the judgment entered on December 16, 1983, in favor of Puritan and against the Keenans pursuant to Code of Civil Procedure section 437c.

In its minute order of November 22, 1983, the trial court also sustained without leave to amend the demurrer of Owens, Hart & Michaelis and Michaelis to the Keenans' cross-complaint for declaratory relief and damages. A judgment of dismissal was thereafter entered on December 16, 1983.

---

[3]Since our ultimate concern is the correctness of the trial court's ruling, not the propriety of its reasoning, we conclude that the fact that the trial court sustained El Monte's demurrer without leave to amend because of the Keenans' failure to return the $100,000 rather than for the reasons which we have stated is of no import. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 226, pp. 4215-4216.) " '. . . No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' " (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19 [112 Cal.Rptr. 786, 520 P.2d 10], quoting *Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].)

While the Keenans did not expressly refer to the sustaining of the demurrer in their notice of appeal, we liberally construe their notice of appeal as a premature but valid notice of appeal from the judgment of dismissal subsequently entered on December 16, 1983. (See *Flowers & Son Development Corp.* v. *Municipal Court* (1978) 86 Cal.App.3d 818, 822, fn. 1 [150 Cal.Rptr. 555]; *Marcotte* v. *Municipal Court* (1976) 64 Cal.App.3d 235, 239 [134 Cal.Rptr. 314]; Cal. Rules of Court, rule 2(c).)

In this appeal from the summary judgment and the judgment of dismissal entered on December 16, 1983, we are only concerned with the Keenans' second cause of action for fraud and misrepresentation. The Keenans in the trial court opposed neither the granting of summary judgment nor the sustaining of the demurrer to their first cause of action. Puritan, Southern Marine, Owens, Hart & Michaelis, and Michaelis were not named as cross-defendants by the Keenans in their third cause of action.

### Demurrer

The Keenans contend that they stated a cause of action for fraud and misrepresentation against Puritan, Owens, Hart & Michaelis, and Michaelis and that said cause of action is not barred by the release executed on behalf of El Monte.

We note at the outset that Puritan was not a party to this demurrer, hence, the question of whether the Keenans alleged facts sufficient to state a cause of action for fraud and misrepresentation against Puritan is not properly before us.

While the trial court's ruling on the demurrer was not based on the release, we note that El Monte and the Hueckels were the only defendants named as releasees in the release. Accordingly, Owens, Hart & Michaelis, and Michaelis did not, could not, and cannot assert the release as a bar to the Keenans' cause of action for fraud and misrepresentation.

██ We have already held in 2d Civil No. 69854 and 2d Civil No. B008269 that there is no actionable fraud or misrepresentation since the alleged misrepresentation on which the Keenans' allegations of fraud and misrepresentation are premised—i.e., the applicability of policy P2-1399— was no misrepresentation. Hence, we conclude that the result reached by the trial court was correct. The Keenans did not, and cannot, state a cause of action for fraud and misrepresentation against Owens, Hart & Michaelis, and Michaelis stemming from their alleged representation regarding the $100,000 limit of liability insurance coverage. Accordingly, we conclude that the demurrer of Owens, Hart & Michaelis and Michaelis to the Keen-

ans' cross-complaint was properly sustained without leave to amend for the same reasons that we concluded that El Monte's demurrer to said cross-complaint was properly sustained without leave to amend.

Next, the Keenans maintain that they can sue Puritan for violations of Insurance Code section 790.03 because the underlying action between El Monte and themselves has been concluded.

The Keenans refer us to paragraph 36 of their cross-complaint for declaratory relief and damages. In paragraph 36, which comprises part of their second cause of action for fraud and misrepresentation, they alleged that certain previously described conduct, namely Puritan's representation that El Monte had a total limit of liability insurance coverage of no more $100,000, "is an unfair trade practice prhibited [sic] by Insurance Code § 790.03 and constitutes an act of bad faith by the cross-defendants PURITAN INSURANCE COMPANY, a corporation, and DOES 1 through 10, inclusive."

The Keenans contend that the allegations in paragraph 36 "clearly give rise to a cause of action based on the Supreme Courts [sic] decision in *Royal Globe Ins. Co.* v. *Superior Court*" (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329].

Whether the Keenans stated facts sufficient to constitute a cause of action for bad faith against Puritan, is a question that is not properly before this court, for as we have already explained, Puritan was not a party to the demurrer interposed by Owens, Hart & Michaelis and Michaelis.

### Summary Judgment

The only contention made by the Keenans which can be construed to relate to its appeal from the summary judgment entered on December 16, 1983, appears in the "CONCLUSION" section of their brief. There, in conclusional language, the Keenans contend that "[t]here is no question but that a triable issue of fact as to the substance of representations regarding available insurance coverage has been raised by EL MONTE'S amended answers to interrogatories and the discovery of Puritan Policy P2-1399."

Insofar as the Keenans cite no legal authority in support of their contention and have not asserted that the summary judgment was erroneously entered, we can treat the point as waived. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 425, p. 4391.) However, since the matter can easily be disposed of on the merits, we proceed to do so.

The Keenans' allegation against Puritan of bad faith under Insurance Code section 790.03 is premised solely on Puritan's alleged fraud and misrepre-

sentation. The Keenans' allegation of fraud and misrepresentation is, in turn, based solely on the applicability of policy P2-1399 to the Keenans' claims against El Monte arising from the air crash.

In light of our holding that policy P2-1399 excludes coverage for the Keenans' allegations or potential allegations of negligent entrustment, instruction, maintenance and products liability (see discussion 2d Civ. No. 69854), and that therefore, as a matter of law, there is no actionable fraud or misrepresentation (see discussion 2d Civ. No. B008269), it necessarily follows that Puritan cannot be liable for bad faith. We conclude that there exist no triable issues of material fact and that Puritan is, therefore, entitled to judgment in its favor on the second cause of action of the Keenans' cross-complaint as a matter of law. We treat the Keenans' failure to mention Southern Marine in their brief as an abandonment of their appeal from the summary judgment as to Southern Marine.

## DISPOSITION

In 2d Civil No. 69854, that portion of the August 13, 1982, judgment decreeing "that Puritan Policy Number P2-1399 affords coverage for negligent entrustment, training and repair and for product liability" and denying the motion to confirm the prior settlement and granting the motion to set aside is reversed. The cross-appeal of P. Dennis Keenan and Arlene Y. Keenan is dismissed.

In 2d Civil No. B008269, the order (judgment) of dismissal entered on April 22, 1983, is affirmed.

In 2d Civil No. B008131, the summary judgment and the judgment of dismissal entered on December 16, 1983, are affirmed.

Each party in each of the aforesaid cases is to bear its own costs.

Woods, P. J., and Arguelles, J., concurred.